NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0146n.06

No. 18-1209

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 26, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CARMITA LEWIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CHARTER TOWNSHIP OF FLINT, et al., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: COLE, Chief Judge; BOGGS and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** After a Flint police officer shot and killed Dominique Lewis as he fled from a traffic stop, Dominique's mother and personal representative of his estate, Carmita Lewis, sued the officer and the Township of Flint. Carmita alleged federal constitutional violations under 42 U.S.C. § 1983 and related state law claims for gross negligence, assault, battery, negligent and/or intentional infliction of emotional distress, and wrongful death. The parties settled the case for $1,390,000, and Carmita filed a motion for authority to distribute the settlement proceeds pursuant to the Michigan Wrongful Death Act. In compensation for loss of society and companionship, the district court ordered distribution of 90% of the remaining funds (about $900,000) to Carmita and 10% (about $90,000) to Shayla Seville Thomas, Dominique's half-sister. On appeal, Carmita argues that we should vacate the district court's award to Shayla because there was not sufficient evidence of a sibling relationship between Shayla and Dominque to support damages for loss of companionship. But because the district court did not clearly err in

determining that this distribution was fair and equitable, we affirm the order distributing the wrongful-death settlement proceeds.

I.

On July 16, 2014 in Flint, Michigan, Dominque Lewis was killed by Flint Police Officer Matthew Needham when Needham fired shots at Dominique as he attempted to flee a traffic stop. Carmita Lewis, Dominque's mother and personal representative of his estate, sued Needham and the Township of Flint in the United States District Court for the Eastern District of Michigan. Carmita alleged federal constitutional violations under 42 U.S.C. § 1983 and related state law claims for gross negligence, assault, battery, negligent and/or intentional infliction of emotional distress, and wrongful death.

In December 2017, the parties settled the case for $1,390,000 and the district court approved the settlement. After payment of attorneys' fees and costs, about $900,000 remained available for distribution. Carmita, pursuant to the Michigan Wrongful Death Act, Mich. Comp. Laws Ann. § 600.2922(6)(a), filed a motion for authority to distribute the remaining settlement proceeds.

The procedure for distribution of settlement proceeds under the Act is as follows: (1) the personal representative of the deceased's estate files a motion for authority to distribute the proceeds; (2) the court orders a hearing on the motion and notice to anyone who may be entitled to damages; (3) eligible claimants present claims for damages to the personal representative on or before the date set for hearing on the motion for distribution; and (4) the court conducts a hearing and orders payment from the proceeds. *See id.* at § 600.2922(6)–(7). Eligible claimants include "[t]he deceased's spouse, children, descendants, parents, grandparents, brothers and sisters." *Id.* § 600.2922(3)(a). If none of the eligible claimants survive the deceased, the court applies the laws

of intestate succession. *Id.* Under the Act, a court may award compensation "in the amount as the court . . . considers fair and equitable considering the relative damages sustained by each of the persons and the estate of the deceased." *Id.* § 600.2922(6)(d). The award can include damages for "the loss of society and companionship of the deceased." *Id.* at § 600.2922(6).

Here, in addition to herself, Carmita identified ten possible claimants: Dominque's (1) maternal grandfather, (2) paternal grandfather, (3) paternal grandmother, (4) sister, (5) half-brother, (6) half-brother, (7) half-brother, (8) half-sister, (9), half-sister, and (10) half-sister. Carmita proposed to distribute 100% of the remaining settlement proceeds to herself. One of the potential claimants, Dominque's half-sister, Shayla Seville Thomas, objected to Carmita's proposed distribution. Shayla claimed she was entitled to 15% of the remaining proceeds (roughly $135,000).

On January 19, 2018, after holding a hearing on Carmita's motion for authority to distribute the proceeds, the district court ordered 85% of the net wrongful death settlement proceeds to be distributed to Carmita "as compensation for her claim of loss of society, support and companionship." DE 97, Order for Distribution of Settlement Proceeds, Page ID 2560. The district court further ordered that 15% of the remaining net proceeds be set aside until Shayla appeared at another hearing "to validate her claim for a share of the net wrongful death settlement proceeds." *Id.*

On February 1, 2018, the district court held a subsequent hearing at which Shayla appeared. During the hearing—which lasted ten minutes—Shayla testified that during the five years that Dominique was incarcerated preceding his death, she never visited him in prison. She said, however, that they "talked on the phone a few times, more than once, about meeting up and catching up" once he was released. DE 104, Hearing Tr., Page ID 2578. She also testified that

they corresponded by written letters but that she did not keep any of the letters. Further, Shayla said that before Dominique was incarcerated, he worked down the street from her, and "from time to time [he] would come and visit [her]." *Id.*

The district court also focused on a dispute regarding whether Shayla had attended Dominque's funeral. The court stated that "Carmita Lewis, mother of the decedent, told the Court that [Shayla was] not at the funeral of the decedent," and Shayla responded that "[t]here's no way [she] could prove that, but [she] definitely was front and center at [her] brother's funeral." *Id.* The district court then asked Dominque's other sister whether Shayla had attended the funeral. In response, the sister said that Shayla did not attend the funeral but did come to the wake. She testified that Shayla "walked in, she looked at the casket, and she walked out." *Id.* at 2582. She also testified that Shayla did not acknowledge Carmita or herself at the wake.

Following this testimony, the district court ruled that it was "satisfied that there was a modest relationship at least with Dominque" and that Shayla was therefore entitled to 10% of the remaining settlement proceeds (roughly $90,000). *Id.* at 2583. Accordingly, on February 6, the district court entered an order distributing 10% and 5% of the remaining proceeds to Shayla and Carmita, respectively, "as compensation for their losses of financial support and/or society and companionship." DE 100, Order Distributing Proceeds, Page ID 2567. The order also dismissed the matter against Needham and the Township of Flint entirely and stated that "entry of this Order concludes this case." *Id.* Carmita timely appealed the district court's order.

II.

This court reviews a district court's distribution of wrongful death settlement proceeds pursuant to state law for clear error. *See Gilbert v. Armstrong World Indust., Inc.*, 947 F.2d 944 (Table), at *1 (6th Cir. 1991) (reviewing district court's distribution of wrongful-death settlement

proceeds under Michigan law and finding that "the district court's division of the proceeds was not clearly erroneous") (citing Fed. R. Civ. P. 52(a)(6)). A district court's "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395 (1948). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even" if "it would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985). In applying the clear error standard to distribution of settlement proceeds under Michigan's wrongful death statute, the Michigan Court of Appeals has counseled that a reviewing court should "determine if there is evidence to support the distribution of the estate on the basis of the parties' relationships to the decedent." *In re Claim of Carr*, 471 N.W.2d 637, 640 (Mich. Ct. App. 1991).

## III.

On appeal, Carmita contends that the district court clearly erred in distributing 10% of the net wrongful-death settlement proceeds to Shayla. She argues that the district court improperly concluded that Shayla should be compensated for the loss of society and companionship of Dominique. Consequently, Carmita requests that this court vacate the district court's award of 10% of the net wrongful-death settlement proceeds to Shayla and instead award her nothing. In the alternative, she requests that this court vacate the award and remand for a new hearing. Shayla did not file a brief in opposition to Carmita's appeal. But because the district court did not clearly err in distributing 10% of the net wrongful-death settlement proceeds to Shayla, we affirm the district court's order distributing the proceeds and concluding the case.

A.

When a settlement arises out of a wrongful-death claim pursuant to the forum state's wrongful-death statute, state law governs distribution of the settlement proceeds. *See Gilbert*, 947 F.2d 944, at *1 (applying Michigan law to distribution of wrongful-death settlement proceeds). This is because when "there is no federal wrongful death statute that provides a remedy," this court looks to state law to "afford[] a remedy lacking in federal law." *Robinson v. Fiedler*, 870 F. Supp. 193, 195 (E.D. Mich. 1994). Here, because there is no federal wrongful-death statute that provides a remedy, this court applies Michigan law to the distribution of settlement proceeds. *Id.*

"In Michigan, '[t]here is no common-law right to recover damages for a wrongfully caused death.'" *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 599 (6th Cir. 2006) (quoting *Jenkins v. Patel*, 684 N.W.2d 346, 350 (Mich. 2004)). Rather, the Michigan Wrongful Death Act governs distribution of wrongful-death damages. *Id.*; Mich. Comp. Laws Ann. § 600.2922; *see also Brereton v. United States*, 973 F. Supp. 752, 755 (E.D. Mich. 1997) ("Wrongful death recoveries in Michigan derive solely from this statute.") (citing *Kirchgessner v. United States*, 958 F.3d 158, 159 (6th Cir. 1992)). Because the statute derogates the common law, it "must be narrowly construed so that only those damages explicitly provided for in the act are recoverable." *Id.*

Under the statute, "the court or jury may award damages as the court or jury shall consider fair and equitable, under all the circumstances." Mich. Comp. Laws Ann. § 600.2922(6). There are three categories of damages available: (1) "reasonable medical, hospital, funeral, and burial expenses for which the estate is liable;" (2) "reasonable compensation for the pain and suffering, while conscious, undergone by the deceased during the period intervening between the time of the injury and death;" and (3) "damages for the loss of financial support and the loss of the society

and companionship of the deceased." *Id.* Thus, the third category, which is at issue in this case, "embrace[s] only losses incurred by a decedent's estate or survivors." *Blaty*, 454 F.3d at 599 (applying Michigan law). Wrongful-death damages for loss of society and companionship compensate survivors "for the destruction of family relationships that results when one family member dies." *McTaggart v. Lindsey*, 509 N.W.2d 881, 884 (Mich. Ct. App. 1993) (citing *Crystal v. Hubbard*, 324 N.W.2d 869, 881 (Mich. 1982)).

The statute, however, "provides little guidance in how to arrive at a distribution that is 'fair and equitable," as "[t]here is, of course, no precise formula for determining damages for loss of a loved one's society and companionship." *Claim of Carr*, 471 N.W.2d at 639–40. Thus, when this court considers whether a district court has distributed wrongful death settlement proceeds in a fair and equitable manner, it evaluates "the type of relationship the decedent had with the claimant in terms of objective behavior as indicated by the time and activity shared and the overall characteristics of the relationship." *Id.* at 640.

## B.

Carmita argues that the district court's distribution of 10% of the wrongful death settlement proceeds to Shayla was not "fair and equitable" based on the nature of Shayla and Dominque's relationship. In essence, she argues that there was not enough evidence on the record for the district court to conclude that Shayla was entitled to compensation for loss of companionship. Carmita contends that Shayla's disputed attendance at Dominique's funeral was irrelevant to determining whether she was entitled to damages, that Shayla never visited Dominque when he was in prison for five years preceding his death, and that Shayla "had no proof" of the writings she claimed she exchanged with Dominique. CA6 R. 19, Appellant Br., at 17–18. Because the record

only contained "meager evidence of a relationship," Carmita argues that the district court's order "was clearly an arbitrary decision not based on the actual evidence." *Id.* at 25.

First, Carmita is likely correct that the district court's focus on whether Shayla attended the funeral was misplaced. There is no Michigan caselaw that suggests funeral attendance bears on whether someone is entitled to wrongful-death settlement proceeds. While perhaps funeral attendance can serve as an objective measure for understanding whether or not there was *any* relationship between a survivor and decedent, one distinct event—which often has hundreds of attendees—does not seem particularly indicative of the "type of relationship the decedent had with the claimant" in relation to the "overall characteristics of the relationship." *Claim of Carr*, 471 N.W.2d at 640. People do and do not attend funerals for many reasons; the district court's apparent focus on discerning whether or not Shayla attended Dominique's funeral—especially when it seemed that Shayla had a strained relationship with other family members who would have been present—seems largely irrelevant to whether she was entitled to a portion of the settlement proceeds.

Even so, the district court did not clearly err in determining that Shayla and Dominique had a sufficient relationship such that Shayla would suffer loss of companionship. Shayla testified that before Dominique was incarcerated, he worked down the street from her, and "from time to time [he] would come and visit [her]." DE 104, Hearing Tr., Page ID 2578. She also testified that when he was incarcerated, they "talked on the phone a few times, more than once, about meeting up and catching up" once he was released. *Id.* She further claimed that they corresponded by written letters—although she did not keep any of the letters. As "there is, of course, no precise formula for determining damages for loss of a loved one's society and companionship," *Claim of Carr*, 471 N.W.2d at 640, a district court's decision about whether a claimant is entitled to

8

distribution of wrongful-death settlement proceeds is largely discretionary. Here, while it would have been reasonable for the district court to find that Shayla was not entitled to damages—evidence of a meaningful sibling relationship is far from strong—under our deferential standard of review, the district court did not clearly err in making this distribution.

The Michigan caselaw that Carmita cites does not compel a different result. First, in *Estate of Kubiskey* and *McTaggart*, where courts denied claimants any damages under the wrongful-death statute, the claimant-decedent relationships at issue were significantly more strained and turbulent than the relationship indicated here. For example, in *Estate of Kubiskey*, the Michigan Court of Appeals affirmed the trial court's decision to not distribute any settlement proceeds to the decedent's granddaughter where the granddaughter "had no relationship whatsoever with the deceased during the final thirteen years of the deceased's life" and when "during that thirteen year period [the granddaughter] made no effort to contact the deceased in any way." 600 N.W.2d 439, 443 (Mich. Ct. App. 1999). Similarly, in *McTaggart*, the court affirmed an order that distributed no settlement proceeds to the decedent's father where "[a]lthough disputed, there was evidence that the appellant never contributed to the financial needs of his daughter, never visited his daughter or expressed any interest to do so, and never took any steps to assert his parental rights." 509 N.W.2d at 884. Those cases, therefore, are distinguishable.

Second, the other wrongful death cases that Carmita cites—*Claim of Carr*, *Hoogewerf*, and *Estate of Barker*—are cases in which the Michigan Court of Appeals upheld small-percentage damage awards even after finding that the claimant-decedent relationships were exceedingly tenuous. For example, in *Claim of Carr*, the court affirmed a distribution of 5% of wrongful death settlement proceeds to a decedent's son even after concluding that because the decedent's son was repeatedly incarcerated, "he clearly was not available to develop a quality relationship with his

mother" and that "evidence strongly indicate[d] that claimant's relationship with his mother was one which he attempted to foster only when he found himself in trouble and on the streets." 471 N.W.2d at 640. Likewise, in *Hoogewerf v. Kovach*, the court affirmed a distribution of 10% of a wrongful-death judgment to a decedent's father despite finding that the decedent and his father had lived separately for all but three months, that the father often failed to make timely support payments, and that the decedent had a "much closer" relationship with his mother and brothers. 463 N.W.2d 160, 161 (Mich. Ct. App. 1990). Similarly, in *In re Estate of Barker*, the court affirmed an order distributing wrongful-death settlement proceeds to a decedent's mother where the decedent and her mother had a "turbulent history," where their relationship "was conflicted and characterized by abandonment issues[,]" and where the decedent "felt rejected" by her mother. No. 297289, 2011 WL 2507843, at *1 (Mich. Ct. App. June 23, 2011) (unpublished) (per curiam). Thus, these cases exemplify times when a reviewing court has affirmed a lower court's distribution of wrongful-death damages even when evidence indicated that the claimant-decedent relationships were tenuous—and notably more strained than the relationship indicated by the evidence here.

Therefore, given evidence indicating that Shayla and Dominique had a limited but functional sibling relationship, the district court did not clearly err in determining Shayla was entitled to 10% of the net wrongful-death settlement proceeds.

IV.

For the reasons stated, we affirm the district court's order distributing the wrongful-death settlement proceeds and concluding the case.